# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>1 Wegeford Circle,<br>Ladera Ranch, California 92694 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 8:24-MJ-00207-DUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2) | Receipt and distribution of child pornography. |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of child pornography. |
| 18 U.S.C. § 2251(d) | Advertisement of child pornography. |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Nina Vicencia

*Applicant's signature*

Nina Vicencia, Special Agent (FBI)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: _____Santa Ana, CA_____

Autumn D. Spaeth, United States Magistrate Judge

*Judge's signature*

*Printed name and title*

AUSA: Melissa Rabbani 714-338-3499

**AFFIDAVIT**

I, Nina Vicencia, being duly sworn, declare and state as follows:

## I.   BACKGROUND OF SPECIAL AGENT NINA VICENCIA

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2010. I am currently assigned to the Los Angeles Office, Orange County Resident Agency. I investigate, among other things, child pornography and child sexual exploitation crimes in the Central District of California. I received training in the investigation of crimes against children during my attendance at the FBI Academy in Quantico, Virginia, and continued my training through participation in child exploitation trainings.  In addition, I have participated in numerous investigations of criminal activity.  During the investigation of these cases, I have executed, and participated in the execution of, numerous search warrants and have seized evidence of violations of the United States Code.

2.    In the performance of my duties, I have investigated and assisted in the investigation of matters involving the possession, collection, production, and transportation of images of child pornography. Also, I have been involved in searches pertaining to the possession, collection, production, and transportation of child pornography through the execution of search warrants.

3.    Through my training and experience, I have become familiar with methods used by people who commit offenses

involving the sexual exploitation of children.  My training and experience have given me an understanding of how people who commit offenses related to the sexual exploitation of children use the internet and digital devices to facilitate and commit those offenses.

4.    Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252 and 2252A, and I am authorized by law to apply for and execute search warrants and arrest warrants issued by federal and state courts.

## II. <u>PURPOSE OF AFFIDAVIT</u>

5.    This affidavit is made in support of search warrants for the premises located at 1 Wegeford Circle, Ladera Ranch, California, 92694 ("SUBJECT PREMISES") and the person of Sherif Ahmed Saad (the "SUBJECT PERSON"), as further described in Attachments A-1 and A-2, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography) and 2251(d) (advertisement of child pornography) (the "Subject Offenses").

6.    The facts set forth in this affidavit are based upon my personal communications with Headquarters Case Agent James Muller.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.  **Overview.** The FBI has identified a group of child pornography producers that sold child sexual abuse material (CSAM) in exchange for Bitcoin currency. The producers provided prospective customers with several different "deposit addresses" where they could deliver Bitcoin and other crypto currency payments. When the customers purchased CSAM, crypto currency was deposited at those addresses. The person(s) in control of the deposit addresses would at times then move the crypto currency to online platforms that would allow them to spend the crypto currency as they wished. By analyzing these transactions, investigators could determine who was moving and spending the crypto currency that had been received as payment for CSAM, ultimately revealing who was responsible for the CSAM sales. Relevant here are three deposit addresses where approximately $1,200 in Bitcoin was transferred in 18 separate transactions between November 2022 and February 2023 to a recipient. The recipient of those funds was Sheriff Saad (the SUBEJECT PERSON) of 1 Wegeford Circle, Ladera Ranch, California, 92694 (the SUBJECT PREMISES), who received approximately $1,200 in Bitcoin CSAM proceeds via accounts that he controlled.

### <u>Background on Snapgod.</u>

8.  It was conveyed to me that since September 2022, the FBI has been investigating online sites relating to a moniker or persona known as "Snapgod": **https://snapgod.co/,**

**https://snapgod.pics/**, **http://snapgod.tv**, and **https://leakzss.is.** The websites solicited payment for CSAM, including CSAM in which victims were required to write words referencing "Snapgod" on their bodies.  The FBI learned of the existence of these online sites, and Telegram channels/usernames based on information provided by a Foreign Law Enforcement Agency (FLA)[1].

9.    SA Muller communicated to me that in the beginning in November of 2022, an FBI Online-Undercover agent (OCE-1) began monitoring several Telegram channels, and several of the above-mentioned websites. The various websites and Telegram channels were all clearly advertising material produced by "Snapgod" and directed users to sites where they could view CSAM

---

[1] This foreign law enforcement agency referenced throughout this affidavit is a regional law enforcement agency of a country with an established rule of law.  There is a long history of U.S. law enforcement sharing criminal investigative information with the foreign law enforcement agency and the foreign law enforcement agency sharing criminal investigative information with U.S. law enforcement, across disciplines and including the investigation of crimes against children.  The foreign law enforcement agency advised U.S. law enforcement that it obtained the information described herein through independent investigation that was lawfully authorized in the foreign law enforcement agency's country pursuant to its national laws.  I am aware through my training and experience and consultation with other U.S. law enforcement agents that tips provided by the foreign law enforcement agency have led to the seizure of evidence of child pornography trafficking and possession in the United States.

To protect the integrity of the foreign law enforcement agency's ongoing investigation into the conduct described in this affidavit and/or related conduct, the foreign law enforcement agency is not named in this affidavit.  However, the name of the foreign law enforcement agency and nature of its investigation will be produced to defense counsel in subsequent legal proceedings relating to this investigation, to the extent required by U.S. federal, constitutional, and/or other relevant law.

advertisements and to another site where users could pay for the CSAM via direct payment and through crypto-currency. Some of the usernames the FBI observed the Snapgod Subjects utilize on Telegram included "cutekittiez" and "Guardin".

10.   As stated to me by SA Muller, on one site ("Advertisement Site"), there were three tabs a user could select – "Bestsellers", "Archives" and "Slaves" (which later became "New Releases"). Under each Tab, numerous products could be purchased, and each product included a description of its content and a link that would direct the user to the site where they could register an account and buy the product. Under the "Archives" Tab, several products were listed with their associated prices. One example is described below from November 2022:

      **a.   Archives V1:**

          **i.**   $47.50

          **ii.**   Product sold 117 times

          **iii.**   You get access to my MEGA link with contained material

          **iv.**   Over 130 young never seen before hacked teen girls

          **v.**   *WARNING: Archive V1 contains O[irignal] C[ontent] snaphacks only, if you want

O[riginal] C[ontent] B[lack]M[ail],[2] look at
v2 instead*

   **b.**   **Archives V3**

     **i.**   **$149.00**

     **ii.**  You get access to my working MEGA folder,
which includes all of the things below

     **iii.** Collection started from October 2022

     **iv.**  Young never before seen teens

     **v.**   Custom videos of bestseller girls (5% of
every bestseller girl is posted in v3 so you
can choose if the girl is worth buying in
the future!)

     **vi.**  New sets added to the SAME link, every week
(updating for 3 months!)

     **vii.** You need Archive V2 in order to be able to
buy this

11. It was also conveyed to me that the "Bestsellers" Tab
included thumbnail images of between six and nine different
females. In most of the images, the young females were nude or
topless, and in some cases with some form of "Snapgod" written
on their chests. Under each image was a product description,
price, and a link to the site where they could register an
account and buy the product. One example is described below from
November 2022:

---

[2] It was conveyed to me that online child exploitation
offenders use the abbreviation "OC" to refer to "original
content" and the abbreviation "BM" to refer to blackmail,
meaning CSAM in which the victim was blackmailed into performing
sex acts on camera.

      **a.**   **Liz**

        i.   $249.99

        ii.   Product sold 24 time

        iii. 20.26gb of unbeatable incest content

        iv.  Selfies of lizzy (some with her friends (nude) and her brother (nude))

        v.   Self made videos (masturbating, undressing, orgasming, anal, crying, self-harm, blood, forced penetration, incest)

        vi.  Incest content (Lizzy gets her younger brother Jack and gives him a blowjob, Jack licks her pussy and eats her ass, Lizzy chokes Jack with her pussy and makes him cry

        vii. BM content

        viii.    3507 ORIGINAL QUALITY PHOTOS AND VIDEOS

12. It was communicated to me that the "Slaves" Tab was initially empty in November of 2022, but was renamed the "New Releases" Tab in March 2023, and included two products with thumbnail images of two new females. Both included product descriptions, prices, and a link to a different site to order and purchase the product. Both new products included erotic pictures or topless nude images of young women.

13. SA Muller conveyed to me that in November of 2022 OCE-1 created an account on the site designated for purchasing material on the "Purchasing Site" (snapgod.tv, and later leakzss.is). The Purchasing Site included several Tabs that

included links to the Advertisement Site, and links to pages describing individual series of pornographic material.

14.  It was communicated to me that once such link would take the user to a new webpage specifically for "Lizzy". The Lizzy page included many of the same product descriptions as described above from the Advertisement site, but also included more sample images of the pornographic product. One such thumbnail image includes a young female standing fully nude next to a much younger male. The male is clearly pre-pubescent given his small stature, lack of pubic development, and youthful physical and facial features. The young male appears to have his mouth on the breast of the female. Another image appears to show the same female, fully nude, straddling the face of what appears to be the same underage male.

15.  It was also conveyed to me that another link for "Izzy" is similar to "Lizzy" described above and includes nude images of a youthful female. The product description includes, "zoo content (Izzy gets her pitbull (bigger than her) and performs sexual activities with him)".

16.  It was communicated to me that under the "How to Buy Content" Tab, the site provides detailed step-by-step instructions on how to execute a purchase of material. The site included methods of payment, crypto-currency deposit addresses, and instructs users how to provide proof of their transaction with screenshots of their crypto transaction hashes.

17.  It was conveyed to me that from November 2022 to January 2024 OCE-1 routinely logged into the Purchasing Site and

identified and captured over 140 different crypto-currency deposit addresses, in four different forms of crypto-currency, that users could use to purchase the pornographic material.

18.  It was comminated to me that the FBI identified at least nine different children in the SnapGod CSAM videos, referred to here as Minor Victims 1-9. Local law enforcement agencies identified Minor Victims 1-7 and 9, and confirmed they were minors at the time of production. Those victims informed local law enforcement that in each instance they were explicitly forced by an unknown person — in some instances they were initially contacted by Snapchat username "julia_zeegan" and in others the person was known to them as "Max" — to perform sexual acts upon request and against their will. MV 8 remains unidentified.

19.  It was conveyed to me that CSAM depicting Minor Victims 1, 2, 5, and 6 were sold on the Advertisement site, along with CSAM depicting an additional victim, Minor Victim 8.

20.  Also conveyed to me was that OCE-1 purchased CSAM from the Advertisement Site, which included CSAM depicting Minor Victims 1, 2, 5, 6, 7, 8 and 9.

21.  SA Muller told me that the material purchased by OCE-1 has been reviewed by FBI Agents. The CSAM videos show that the Snapgod subject(s) coerced the victims into engaging in sexually explicit conduct. In the videos, the victims plead with the subjects to stop the abuse. In some instances, the Snapgod subject(s) forced the victims to harm themselves or to engage in sex acts with pets, siblings, and strangers.

22.   The example conveyed to me was that in a video depicting Minor Victim 9 engaged in sexually explicit conduct, which appeared to be a screen recording created by another user through Snapchat, there are threats used to force Minor Victim 9 to create CSAM of herself. Additionally, a local law enforcement agency that was investigating the production of Minor Victim 9's child pornography confirmed that the material was coerced from the Minor Victim.

**Identifying Sherif Saad as a Recipient of Snapgod Deposits**.

23.   SA Muller told me that the FBI began analyzing transaction data to and from the crypto currency deposit addresses provided by the Snapgod Subject(s) on their purchasing site beginning in November of 2022.

24.   SA Muller further stated that the FBI identified the below Bitcoin deposit address on the SnapGod Purchasing site in February of 2023:

bc1q5yx44f2lhhdh2mw6k6jytxghjt2rxq5unqu74c

25.   Utilizing a crypto currency analytical tool, SA Muller told me that the FBI was able to investigate other bitcoin transactions going to and from the above deposit address. Six such transactions are detailed below:

| Transaction Hash | Date | USD |
|---|---|---|
| 8042e391edfb66f5cca2634b982213f505f2fb1770ffa7e1729e5bc714baa096 | 2/1/2023 17:12 | $ 37.97 |
| 7349202951e8ae882823d25ea0e63974a0a5f9dff8f4702a53d6c23de7e2200b | 2/8/2023 7:22 | $ 300.46 |
| 9aff754c92b8815f4100954cf0b375e45e3b4fc8e9088b7925653d91c821e104 | 2/9/2023 7:19 | $ 73.40 |
| dbb2e34e12f09e5858a9a8bab7a4ed3a86c896b8be4ca7fbec1e34e0525d1dd9 | 2/9/2023 7:50 | $ 355.96 |
| c47e6c86005ec1f69d1d64eaa992aef74d19ed2c1d01921cb4d9e888d3859d78 | 2/9/2023 8:06 | $ 354.76 |
| b87ca906c3089012148ede0c6fdc72fa141b8f6caee7cb52cd4712f33de600a5 | 2/9/2023 19:33 | $ 73.16 |

26.   In summary, what was conveyed to me was that five of the above six transactions representing a total of $839.76 went from the above bitcoin deposit address explicitly advertised as a means to pay for CSAM from the SnapGod Subjects, to an account at Roobet.com. One transaction for $355.96 went from the same account at Roobet.com to the SnapGod deposit address.

27.   The FBI served a Subpoena to Roobet.com (an online crypto-currency-based gambling site based out of Curacao) on May 23, 2023. Roobet confirmed that the below listed user was associated with the above listed transactions:

```
Username: Deez982
Name Entered by User: Sherif Saad
Date of Birth Entered by User: 04/29/1970
```

28.   It was communicated to me that an additional transaction was traced from the deposit address on the SnapGod Purchasing site in February of 2023 listed in paragraph 24 (bc1q5yx44f2lhhdh2mw6k6jytxg…):

| Transaction Hash | Date | USD |
|---|---|---|
| b8e4aaa31c8d264ea4911b061af623a2783e4f96cea958691e43a39f80737701 | 2/1/2023 12:40 | $ 18.15 |

29.   In summary, it was conveyed that approximately $18 was sent from the above bitcoin deposit address explicitly advertised as a means to pay for CSAM from the SnapGod Subjects to an account at paywithmoon.com. Pay With Moon was a crypto currency service provider that allowed its users to convert crypto currency into virtual Visa cards and make payments to online merchants.

30.  SA Muller conveyed to me that the FBI issued a Subpoena to Pay With Moon on August 11, 2023. Ken Kruger, the CEO of Pay With Moon, provided the account holder Information:

    Account Holder: Sherif Ahmed Saad
    Email: ggxdhaha01@gmail.com

31.  SA Muller further communicated that in addition to identifying the Account Holder, Kruger provided the transaction history associated with Sherif Saad's Pay With Moon account. Saad's transaction history revealed 14 more transactions listed below that were all conducted with previously identified SnapGod Deposit addresses:

| Transaction Hash | Date | USD |
|---|---|---|
| 422b1b7ba93f4846f28026ef6903cfb08c2b382454e9b3dd64d4047a4eba7101 | 2022-11-20T17:14:31Z | $ 88.00 |
| cf1f4154b504a815f7f869c7f639165c95ae7132a4eefca0097c855a48ac5280 | 2022-11-20T17:14:31Z | $ 20.00 |
| f4c9b2b097a58a94c227e8424455ce9ea545ee6d0a772e15e536651eb4c5be26 | 2022-11-28T15:40:39Z | $ 20.00 |
| 9e6cdd20beefa4c549f77d4be4d8b4037cd8d8d655e241485be57cfe755afde3 | 2022-11-28T15:40:39Z | $ 21.00 |
| 4a5e8877c357c1e318b93e1226d0c79dcbee59fd6a5d4ee4bf48b9c8b0ea7749 | 2022-12-09T13:58:16Z | $ 6.49 |
| e3feb5fb820f5b793ba0817787984e2472cf454ee8475c01e2310680ca4296e5 | 2022-12-10T10:43:29Z | $ 20.00 |
| 1363c727ffeae26e1625dfe9dfc30bf14d303fb990104e15449351c4dfccaa9d | 2022-12-13T07:27:58Z | $ 10.00 |
| 60b2f9f26fa527e4a809dac7d314ed5e6364001c78b7bd44a82403f64b3f4341 | 2022-12-15T12:12:14Z | $ 20.00 |
| d593ad3efbc9ae2a3efcfa136bc02767f18770a1fab0edecc4c7639c43864676 | 2022-12-15T17:55:27Z | $ 20.00 |
| 9594437f2d3f436b334513581a3abed4f7320f18a81a81b92231ce396c485730 | 2022-12-16T05:42:43Z | $ 20.00 |
| 5b3ac452da5916e7c313269a4670ace929a4b41df93a80df482a63690ff203d3 | 2022-12-16T12:47:31Z | $ 40.00 |
| 85400532bed2fcad69e8b88e9d8d9c1d1800bc0faf9ad3baed2c37b2a58415d4 | 2022-12-16T15:49:39Z | $ 100.00 |
| 746027446b2539caf85b81aafb8464c5ec45de99fc5f774dedf75b8579ede428 | 2022-12-30T12:06:04Z | $ 20.00 |
| 4a4d88f8568536c5d50db967456bc309204ec3372d25830781f3f3d7c7161723 | 2022-12-30T15:31:02Z | $ 20.00 |

32.  In summary, it was conveyed that $445.49 was sent from three different bitcoin deposit addresses explicitly advertised as a means to pay for CSAM from the SnapGod Subjects to Sherif Saad's account at paywithmoon.com. One of the deposit addresses was previously mentioned in paragraphs 24 and 28. Two additional

addresses were originally identified during undercover engagements with the SnapGod Subjects.

33.  SA Muller communicated to me that in approximately November to December of 2022, the FBI conducted a controlled purchase of CSAM material from the Snapgod Subject(s). In an undercover session, the SnapGod Subjects provided the below deposit address as a means for OCE-1 to buy CSAM material:

bc1qxdamh7yru5ctj6x2uvypx94v7snpsahmlsk6w6

34.  SA Muller told me that OCE-1 sent Bitcoin to the above address and received CSAM material from the Snapgod Subject(s) to include Minor Victims 1, 2, 5, 6, 7, 8 and 9.

35.  SA Muller communicated to me that the same address was identified as being the source of $385.49 of the $445.49 total that Saad received from known SnapGod Deposit addresses into his Pay With Moon account. In total, 12 different transfers of funds occurred with this specific deposit address from November 2022 to December 2022.

36.  Additionally, SA Muller told me the OCE engaged with the SnapGod subjects in a direct messaging session in January of 2023. On January 21, 2023 the Snapgod Subjects stated on their Telegram channel that they were willing to sell "the entire project" to include the Telegram channel, website, unreleased content, control of the servers and all profits. The message stated the asking price of $1,250 and to direct message the Telegram handle "@cutekittiez".

37.  SA Muller futher informed me OCE engaged with @cutekittiez on January 24, 2024. The discussion centered on the

OCE purchasing the site and all ownership therein. When OCE asked how the payment would work, @cutekittiez provided the below bitcoin address:

bc1qq7tl3g7nt5en3flf5tcya2f5ake7fp8pkpquxe

38.  It was conveyed to me that two of the 14 transactions outlined above that went to Saad's Pay With Moon account were from the above address provided by @cutekittiez as a means to effectively purchase the SnapGod enterprise. Both of the payments were on December 30, 2022.

39.  It was communicated to me that the FBI analyzed the transactions provided by Pay With Moon to determine where and how funds were spent once Saad had converted his crypto currency into virtual Visa cards. Pay With Moon provided merchant information concerning where the virtual Visa cards associated with Saad's account were spent.

40.  I was further informed that the FBI identified three transactions linked to WalMart from Saad's Pay With Moon Account. The FBI issued a subpoena to WalMart for details of the three transactions in question. On January 25, 2024 WalMart provided transaction details and identified the name associated with the orders as Sherif Saad, and the email associated with the orders as ggxdhaha01@gmail.com.

41.  SA Muller communicated to me that the FBI identified four attempted transactions linked to CashApp (Block Inc) from Saad's Pay With Moon Account. The FBI issued a subpoena to Block Inc for details of the four transactions in question. On January 18, 2024, Block Inc provided account details for the client

associated with the Cash App account that attempted transactions with Sherif Saad's Pay With Moon account:

Display Name: Ahmed Saad
Email: ggxdhaha01@gmail.com
Address: 1 Wegeford, Circle Ladera Ranch, CA, 92694

42.  It was conveyed to me that in October 2022 local law enforcement in Holly Springs, Georgia responded to a complaint filed by a concerned parent. In summary, Holly Springs Police Department Case # 122-6527 states that a SnapChat user "Peti_dn" had been impersonating a juvenile male and soliciting nude images from juvenile females in the Holly Springs area as well as internationally.

43.  I was informed that the SnapChat account identified by the victims in Holly Springs, Georgia of "Peti_dn" was further investigated by Holly Springs PD and the FBI. In the SnapChat Search Warrant return from Holly Springs PD concerning the account, it was identified that a previous username for peti_dn was "ivanovpepi". A subpoena was issued to SnapChat for the username ivanovpepi which also identified the display name of "Petar Ivanov".

44.  SA Muller conveyed to me that Sherif Saad's Pay With Moon account conducted 18 transactions with PayPal. The FBI issued a Subpeona to PayPal for account information for any accounts associated with Sherif Ahmed Saad or the email address ggxdhaha01@gmail.com (which was listed on Saad's Pay With Moon account). PayPal responded on January 23, 2024, with information from five separate PayPal accounts all sharing the email address ggxdhaha01@gmail.com. One account which was created in July of

2020 had the First and Last name of the account listed as "Petar Ivanov". Three other accounts had minimal client information but included the same State and Zip code of the Subject Premise - California, 92694.

45.  Open-source research identified the below identifiers associated with Sherif Ahmed Saad:

Date of Birth: 4/29/1970
Social Security number: XXX-XX-3018
Address: 1 Wegeford Circle, Ladera Ranch, California, 92694

46.  Surveillance was conducted on May 3, 2024, at 1 Wegeford Circle, Ladera Ranch, California, 92694. The following observations were made during the surveillance:

a.  A black Cadillac Escalade bearing CA license plate 6572M1 was present on the curb adjacent to 1 Wegeford Circle. Law enforcement database checks showed this vehicle registered to Digital and Graphic Solutions, which is a business licensed to SAAD with the location of 1 Wegeford Circle, Ladera Ranch California.

b.  A BMW sedan bearing CA license plate E052W1 was present in the driveway of 1 Wegeford Circle. Law enforcement database checks showed this vehicle registered to SAAD, with the address listed as 1 Wegeford Circle, Ladera Ranch California.

c.  At approximately 6:08 am, the garage door of 1 Wegeford Circle opened, and an individual fitting the description of SAAD, wearing a white T-shirt, was standing in the garage door frame. At approximately 6:09 am, the individual went back inside, and the garage door closed.

47.  Based on the foregoing, there is probable cause that Sherif Ahmed SAAD has received proceeds from the production, advertisement, sale, and distribution of CSAM.  Accordingly, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found in a search of the SUBJECT PREMISES and the SUBJECT PERSON.

## IV.  BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

48.  In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

49.  Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.  Computers and Child Pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.  <u>File Storage</u>.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c.  <u>Internet</u>.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a

collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.  The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    d. <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

    e.    An Internet Protocol address ("IP Address") is a
unique numeric address used to connect to the Internet.  Every
computer or device accessing the Internet must be assigned an IP
address so that Internet traffic sent from and directed to that
computer or device may be directed properly from its source to
its destination. Most Internet Service Providers ("ISPs")
control a range of IP addresses. IP addresses can be "dynamic,"
meaning that the ISP assigns a different unique number to a
computer or device every time it accesses the Internet. IP
addresses might also be "static," if an ISP assigns a user's
computer a particular IP address that is used each time the
computer accesses the Internet. ISPs typically maintain logs of
the subscribers to whom IP addresses are assigned on particular
dates and times

    f.    IP Address-IPv4 is a series of four numbers, each
in the range 0-255, separated by periods (e.g., 121.56.97.178).
In simple terms, one computer in a home may connect directly to
the Internet with an IP Address assigned by an ISP.  What is now
more typical is that one home may connect to the Internet using
multiple digital devices simultaneously, including laptops,
tablets, smart phones, smart televisions, and gaming systems, by
way of example.  Because the home subscriber typically only has
one Internet connection and is only assigned one IP Address at a
time by their ISP, multiple devices in a home are connected to
the Internet via a router or hub.  Internet activity from every
device attached to the router or hub is utilizing the same
external IP Address assigned by the ISP.  The router or hub

"routes" Internet traffic so that it reaches the proper device.
Most ISPs control a range of IP Addresses.  The IP Address for a
user may be relatively static, meaning it is assigned to the
same subscriber for long periods of time, or dynamic, meaning
that the IP Address is only assigned for the duration of that
online session.  Most ISPs maintain records of which subscriber
was assigned which IP Address during an online session.

g.   IP Address – IPv6.  Due to the limited number of
available IPv4 IP addresses, a new protocol was established
using the hexadecimal system to increase the number of unique IP
addresses.  An IPv6 consists of eight sets of combination of
four numbers 0-9 and/or letters A through F.  An example of an
IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

h.   The following definitions apply here:

i.   "Child erotica," as used herein, means
materials or items that are sexually arousing to persons having
a sexual interest in minors but that are not necessarily obscene
or do not necessarily depict minors engaging in sexually
explicit conduct.

ii.   "Child pornography," as defined in 18 U.S.C.
§ 2256(8), is any visual depiction, including any photograph,
film, video, picture, or computer or computer-generated image or
picture, whether made or produced by electronic, mechanical or
other means, of sexually explicit conduct, where: (a) the
production of the visual depiction involved the use of a minor
engaged in sexually explicit conduct; (b) the visual depiction
is a digital image, computer image, or computer-generated image

that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

        iii. "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

        iv.  "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

v.   "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

vi.   "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

vii. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might

23

be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

viii.   "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet. FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

ix. "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

x.   "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

xi. "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of

24

events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

        xii. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

        xiii.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

        xiv. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

        xv.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xvi. A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xvii.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xviii.    A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## V. <u>TRAINING, EXPERIENCE AND DEFINITION OF TERMS-CRYPTOCURRENCY</u>

50.  Based on information related to me by other law enforcement officers involved in the investigation of child pornography and other investigations involving the use of Cryptocurrency, I know the following information about Cryptocurrency:

51.  Cryptocurrency is a type of decentralized virtual currency, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.  Examples of cryptocurrency are Bitcoin,

Litecoin, and Ether.  Cryptocurrency can exist digitally on the
Internet, in an electronic storage device, or in cloud-based
servers.  Although not usually stored in any physical form,
public and private keys (described below) used to transfer
cryptocurrency from one person or place to another can be
printed or written on a piece of paper or other tangible object.
Cryptocurrency can be exchanged directly person to person,
through a cryptocurrency exchange, or through other
intermediaries.  Generally, cryptocurrency is not issued by any
government, bank, or company; it is instead generated and
controlled through computer software operating on a
decentralized peer-to-peer network.  Most cryptocurrencies have
a "blockchain," which is a distributed public ledger, run by the
decentralized network, containing an immutable and historical
record of every transaction.[3]  Cryptocurrency is not illegal in
the United States.

52.  Bitcoin[4] ("BTC") is a type of cryptocurrency.  Payments
or transfers of value made with bitcoin are recorded in the
Bitcoin blockchain and thus are not maintained by any single
administrator or entity.  As mentioned above, individuals can
acquire bitcoin through exchanges (i.e., online companies which

---

[3] Some cryptocurrencies operate on blockchains that are not
public and operate in such a way to obfuscate transactions,
making it difficult to trace or attribute transactions.

[4] Since Bitcoin is both a cryptocurrency and a protocol,
capitalization differs.  Accepted practice is to use "Bitcoin"
(singular with an uppercase letter B) to label the protocol,
software, and community, and "bitcoin" (with a lowercase letter
b) to label units of the cryptocurrency. That practice is
adopted here.

allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can "mine" bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain.  Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it is not completely anonymous, bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

53.  Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key or address is akin to a bank account number, and a private key is

akin to a PIN or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key").   A public address is represented as a case-sensitive string of letters and numbers, 26-25 characters long.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

54.  Although cryptocurrencies such as bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is a common means of payment for illegal goods and services on hidden services websites operating on the Tor network.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces. As of December 14, 2022, one bitcoin was worth approximately $18,253.20, though the value of bitcoin is generally much more volatile than that of fiat currencies.

55.  Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a

PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[5] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

---

[5] A QR code is a matrix barcode that is a machine-readable optical label.

56.   Bitcoin "exchangers" and "exchanges" are individuals
or companies that exchange bitcoin for other currencies,
including U.S. dollars.  According to Department of Treasury,
Financial Crimes Enforcement Network ("FinCEN") Guidance issued
on March 18, 2013, virtual currency administrators and
exchangers, including an individual exchanger operating as a
business, are considered money services businesses.[6]  Such
exchanges and exchangers are required to register with FinCEN
and have proper state licenses (if required under applicable
state law).  In conversations with fellow law enforcement
colleagues with training and experience in cryptocurrency
investigations, I have learned that registered money
transmitters are required by law to follow Bank Secrecy Act
anti-money laundering ("AML") regulations, "Know Your Customer"
("KYC") protocols, and other verification procedures similar to
those employed by traditional financial institutions. For
example, FinCEN-registered cryptocurrency exchangers often
require customers who want to open or maintain accounts on their
exchange to provide their name, address, phone number, and the
full bank account and routing numbers that the customer links to
an exchange account.

57.   Some companies offer cryptocurrency wallet services
which allow users to download a digital wallet application onto
their smart phone or other digital device.  A user typically

---

[6] *See* "Application of FinCEN's Regulations to Person
Administering, Exchanging, or Using Virtual Currencies,"
*available at* https://www.fincen.gov/resources/statutes-
regulations/guiadance/application-fincens-regulations-persons-
administering.

accesses the wallet application by inputting a user-generated
PIN code or password.  Users can store, receive, and transfer
cryptocurrencies via the application; however, many of these
companies do not store or otherwise have access to their users'
funds or the private keys that are necessary to access users'
wallet applications.  Rather, the private keys are stored on the
device on which the wallet application is installed (or any
digital or physical backup private key that the user creates).
As a result, these companies generally cannot assist in seizing
or otherwise restraining their users' cryptocurrency.
Nevertheless, law enforcement could seize cryptocurrency from
the user's wallet directly, such as by accessing the user's
smart phone, accessing the wallet application, and transferring
the cryptocurrency therein to a law enforcement-controlled
wallet.  Alternatively, where law enforcement has obtained the
recovery seed for a wallet (see above), law enforcement may be
able to use the recovery seed phrase to recover or reconstitute
the wallet on a different digital device and subsequently
transfer cryptocurrencies held within the new wallet to a law
enforcement-controlled wallet.

     58.  The term Bitcoin "deposit address" refers to the
specific alpha-numeric code that one individual would provide to
another individual in order to execute a bitcoin transaction. It
is essentially where the recipient wants the bitcoin to be sent
to in a traditional sense, where the recipient can control the
funds and spent it how they wish. The concept is very much akin
to a routing and account number for a traditional fiat currency

wire transfer. The deposit address is unique, and can be re-used.

## VI.   TRAINING & EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

59.   Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

b.   Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and

often maintain lists of names, addresses, and telephone numbers
of individuals with whom they have been in contact and who share
the same interests in child pornography.  These individuals
often maintain possession of these items for long periods of
time.

60.  Digital child pornography on a digital device is easy
to maintain for long periods of time.  Modern digital devices
often have extremely large storage capacities.  Furthermore,
cheap and readily available storage devices, such as thumb
drives, external hard drives, and compact discs make it simple
for individuals with a sexual interest in children to download
child pornography from the Internet and save it – simply and
securely – so it can be accessed or viewed indefinitely.

61.  Furthermore, even if a person deleted any images of
child pornography that may have been possessed or distributed,
there is still probable cause to believe that there will be
evidence of the illegal activities – that is, the possession,
receipt, and/or distribution of child pornography – at the
SUBJECT PREMISES or on the SUBJECT PERSON.  Based on my training
and experience, as well as my conversations with digital
forensic experts, I know that remnants of such files can be
recovered months or years after they have been deleted from a
computer device.  Evidence that child pornography files were
downloaded and viewed can also be recovered, even after the
files themselves have been deleted, using forensic
tools.  Because remnants of the possession, distribution, and
viewing of child pornography is recoverable after long periods

of time, searching the SUBJECT PREMISES could lead to evidence
of child exploitation offenses.

### VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

62.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

63.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

   b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

64.  It should be noted that because SAAD's crimes involved the use of virtual currency and encryption, the items to be seized could be stored almost anywhere within a residence, in both physical and electronic formats.  For example, Attachment B seeks bitcoin addresses, passwords, and recovery seeds.  These pieces of data comprise long and complex character strings, and in my training and experience I know that many virtual currency users write down or otherwise record and store such items because they are too long to commit to memory.  As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence.  For all of the foregoing reasons, probable cause exists to believe that such records, data, and documents will be found within the SUBJECT PREMISES, including in computers or on other devices that store electronic data.

65.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress the SUBJECT PERSON's thumb and/or
fingers on the device(s); and (2) hold the device(s) in front of

the SUBJECT PERSON's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

66.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.        CONCLUSION

67.   For all the reasons described above, there is probable cause to believe to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography) and 2251(d) (advertisement of child pornography), will be found in a search of SUBJECT PREMISES and the SUBJECT PERSON, as described in Attachments A-1 and A-2.

/s/ Nina Vicencia

Nina Vicencia, Special Agent
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R.  Crim. P. 4.1 by
telephone on this __ day of May
2024.

HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

**<u>ATTACHMENT A-1 PREMISES TO BE SEARCHED</u>**

The premises to be searched is the property located at 1 Wegeford Circle, Ladera Ranch, California, 92694, and includes any and all attached and/or detached garages, annexes, outbuildings, sheds, storage locations, and locked and/or unlocked areas ("SUBJECT PREMISES").  The SUBJECT PREMISES appears to be a single-family home of approximately 3,000 square feet in a residential area. This warrant authorizes the forensic examination of this property and any electronic devices found thereon for the purpose of identifying the electronically stored information described in Attachment B.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2251 (production of child pornography), 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography) and 2251(d) (advertisement of child pornography), namely:

        a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

        b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, of child pornography.

        c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, including but not limited to financial records, tending to identify persons involved in the production, possession, receipt, distribution, solicitation, or transportation of child pornography as defined in 18 U.S.C. § 2256.

        d.    Any digital currency including, but not limited to, Bitcoin stored on electronic wallets or other forms of

wallets or other means, cryptocurrency private keys and recovery seed, and records relating to income derived from the advertisement, distribution, production, sale and or purchase of child pornography.

       i.  With respect to any cryptocurrencies to be seized, such as Bitcoin, cryptocurrency private keys and recovery seeds (as described in paragraph 1(d)), the cryptocurrency (or digital currency) private keys, and recovery seeds to be seized is evidence, contraband, involved in or traceable to violations of the Subject Offenses. Seizure of any cryptocurrency/digital currency private keys and recovery seeds shall also be construed to include seizure of any cryptocurrency related to any such seized private keys and/or recovery seeds, and such seizure shall allow transfer of any such related cryptocurrency to one or more government-controlled accounts, or "wallets."

    e.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

h.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

i.   Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to Snapchat, MEGA, Telegram, Bitcoin, or Dropbox.

k.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

l.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to the SnapGod Subjects to include the Snapchat account or usernames julia_zeegan, Max, peti_dn, Petar Ivanov, or the Telegram usernames cutekittiez, Guardin, or Max.

m.   Any records, documents, programs, applications, materials, and files relating to IP addresses 35.143.86.134 and 35.143.87.141.

n.   Any records, documents, programs, applications, materials, and files relating to https://snapgod.co/, https://snapgod.pics/, or http://snapgod.tv or otherwise referencing the term "Snapgod" and variations thereof.

o.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

p.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

2.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, encryption keys, biometric keys and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

6.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed

120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

          b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

               i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the scope
of items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the scope of items to be seized.

               ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

               iii. The search team may use forensic examination
and searching tools, such as "EnCase," "Griffeye," and "FTK"
(Forensic Tool Kit), which tools may use hashing and other
sophisticated techniques, including to search for known images
of child pornography.

          c.   The search team will not seize contraband or
evidence relating to other crimes outside the scope of the items
to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Sherif Ahmed SAAD's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of SAAD's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

11

apply to any search of digital devices pursuant to any other
court order.